IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANDREW J. ERVIN,                          :

    Plaintiff,                        :

v.                                        :       Civil Action No. GLR-13-2080

JP MORGAN CHASE BANK NA,                  :

    Defendant.                        :

## MEMORANDUM OPINION

Pending before the Court is Defendant JP Morgan Chase Bank NA's ("Chase") Motion for Summary Judgment (ECF No. 23) and Motion for Leave to File Surreply (ECF No. 35), and Plaintiff Andrew J. Ervin's Cross Motion for Partial Summary Judgment (ECF No. 24). Having reviewed the pleadings and supporting documents, the Court finds no hearing necessary. See Local Rule 105.6 (D.Md. 2014). For the reasons outlined below, the parties' Motions for Summary Judgment will be denied and Chase's Motion for Leave to File Surreply will be granted.

## I. BACKGROUND

In March 2007, Plaintiff Andrew J. Ervin refinanced the mortgage on his residence at 12722 Manor Road, Glen Arm, Maryland by borrowing $380,000 from GSF Mortgage Corporation and securing the debt with a note and deed of trust. Thereafter, Ervin defaulted on the loan and Chase became the holder of the loan. Effective August 1, 2012, the parties entered into a Loan

Modification Agreement ("LMA"), pursuant to an on-the-record settlement agreement reached in Andrew J. Ervin v. JPMorgan Chase Bank, N.A., Case No. 03-C-10-011259, Circuit Court for Baltimore County, which lowered Ervin's interest rate and monthly payment. All other terms and provisions of the original loan documents remained in full force and effect.

The LMA provided for an estimated monthly escrow payment of $814.08, which included $516.17 for private mortgage insurance ("PMI"). Additionally, the LMA indicated that the escrow amount and PMI may periodically change over the term of the loan. By its annual escrow statement dated July 11, 2012 ("Annual Escrow Statement"), Chase informed Ervin of an escrow shortage of $5,636.80[1], and, as a result of the shortage, increased Ervin's monthly mortgage payment from $1,671.13 to $1,746.15 beginning October 1, 2012.

Ervin made his first payment under the LMA on July 11, 2012, in the amount of $1,671.09. Ervin made his next payment of $1,670.98 on August 2, 2012, which was applied to his account as the payment due on September 1, 2012. A statement issued by Chase to Ervin on August 6, 2012, indicated the next amount due on October 1, 2012, including the escrow increase effective that day, was $1,746.15. Nevertheless, beginning on September 17, 2012, through March 1, 2013, Ervin tendered partial payment in the amount

---

[1] The Court finds significant to note, however, that the record is devoid of any evidence establishing an escrow account history resulting in the purported shortage.

of $1,670.98.  By correspondence dated February 11, 2013, Chase gave notice to Ervin of its intent to foreclose the Loan.

Ervin initiated this suit on June 6, 2013, in the Circuit Court for Baltimore City, Maryland alleging violations of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law §§ 14-201 et seq. (West 2014) (Count I), the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101 et seq. (West 2014) (Count II), and the Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. §§ 7-401 et seq. (West 2014) (Count III).  (ECF No. 2).  All of Ervin's claims are based on the premise that the Notice of Intent to Foreclose and the monthly mortgage statements sent between July 2012 and March 2013 relied upon miscalculations and misrepresentations in the Annual Escrow Statement which resulted in false and misleading statements that Ervin was delinquent, owed late fees, and Chase could foreclose on his mortgage account.  Chase removed the case to this Court on July 19, 2013.  (ECF No. 1).

Chase now moves for summary judgment arguing the statements contained in the Annual Escrow Statement, monthly mortgage statements, and Notice of Intent to Foreclosure were accurate and all delinquencies, defaults, and late charges are attributable to Ervin's decision to not pay the full amount of the mortgage payment when due.  Ervin moves for partial summary judgment as to Chase's liability on his claims in this action arguing Chase failed to properly apply Ervin's payments under the LMA and knowingly elected

3

to include premiums for a PMI policy it knew had been canceled prior to Ervin's loan modification as part of Ervin's monthly escrow amount.   According to Ervin, these actions rendered all subsequent mortgage statements and the Notice of Intent to Foreclose false, deceptive, and misleading.

## II. DISCUSSION

### A.   Motion for Leave to File SurReply

As a preliminary matter, the Court finds good cause to allow Chase leave to file a surreply.   Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed.   See Local Rule 105.2(a) (D.Md. 2014).   "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."   Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citing Lewis v. Rumsfeld, 154 F.Supp.2d 56, 61 (D.D.C. 2001)), aff'd, 85 F.App'x 960 (4th Cir. 2004).

The parties agree that, for the first time in his Reply to Opposition to Cross Motion for Summary Judgment ("Reply"), Ervin argues Chase's Amended Interrogatory Answers constitute a "sham affidavit."   Accordingly, Chase's Motion for Leave to File Surreply will be granted.

### B.   Sham Affidavit

Ervin argues in his Reply that the Amended Interrogatory Answers, attached as exhibit A-1 to Chase's Opposition to Ervin's Cross Motion for Partial Summary Judgment ("Chase's Opposition"),

should be disregarded under the sham affidavit doctrine. Specifically, Ervin contends Amended Interrogatory Answers numbers 5, 6, and 13 flatly contradict the original Interrogatory Answers without explanation.

"[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999). "Application of the sham affidavit rule at the summary judgment stage 'must be carefully limited to situations involving flat contradictions of material fact.'" Zimmerman v. Novartis Pharm. Corp., 287 F.R.D. 357, 362 (D.Md. 2012) (quoting Mandengue v. ADT Sec. Sys., Inc., No. ELH-09-3103, 2012 WL 892621, at *18 (D.Md. Mar. 14, 2012)).

The Amended Interrogatory Answers were submitted as required by, and in compliance with, Federal Rule of Civil Procedure 26(e).[2] The factual basis for the amended answers are clearly supported by the record as discussed in more detail below. Further, Chase offers a comprehensive explanation for the alleged disparities in its Surreply, which resolves any contradiction. The Court,

---

[2] "A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . ." Fed.R.Civ.P. 26(e).

therefore, declines to strike Chase's Amended Interrogatory Answers under the sham affidavit doctrine.

**C.   Motions for Summary Judgment**

   **1.   Standard of Review**

   Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).

   In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party.  Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in the original).

   A "material fact" is a fact that might affect the outcome of a party's case.  Id. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).  Whether a fact is considered to be "material" is determined by the

substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. Rule 56(c) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)).

**2.   Analysis**

**a. Chase's Motion for Summary Judgment**

First, Chase argues Ervin's claims are preempted by the Real Estate Settlement Procedures Act ("RESPA"). The Court disagrees. The anti-preemption clause of RESPA provides:

> This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only the extent of the inconsistency.

12 U.S.C. § 2616 (2012).   Thus, state laws that are not inconsistent with RESPA are not preempted by RESPA.   Munoz v. Fin. Freedom Senior Funding Corp., 567 F.Supp.2d 1156, 1164 (C.D.Cal. 2008).   The MCDCA, MCPA, and MMFPA govern the activities of mortgage servicers in the state of Maryland.   To the extent Ervin's claims rely on RESPA, Chase has not identified, nor can the Court find, any provision of the MCDCA, MCPA, and MMFPA that is inconsistent with Regulation X[3].   Accordingly, Ervin's claims are not preempted by RESPA.

Next, Chase argues Ervin is barred from asserting against it any facts or claims arising from, or relating to, the mortgage loan prior to an October 3, 2012 on-the-record settlement agreement reached in Andrew J. Ervin v. JPMorgan Chase Bank, N.A., Case No. 03-C-10-011259, Circuit Court for Baltimore County.

Under Maryland law, a lawsuit is barred by res judicata when: (1) the two actions involve either the same parties or persons in privity with those parties; (2) the claim presented is either identical to, or is such that it could have been resolved, in the earlier dispute; and (3) there was a prior final adjudication on the merits.   McCreary v. Benifical Mortg. Co. of Md., No. AW-11-CV-01674, 2011 WL 4985437, at *3 (D.Md. Oct. 18, 2011).   Distinct

---

[3] The regulation governing Section 10 of RESPA, limiting the amount of money a lender may require a borrower to hold in escrow for payment of taxes and insurance premiums, can be found at 12 C.F.R. § 1024 (2012).   This regulation is generally referred to as Regulation X.

from res judicata is the doctrine of collateral estoppel.  When an issue of law or fact has already been determined by a valid and final judgment, collateral estoppel bars a party from relitigating the issue in a subsequent action between the same parties.  Cosby v. Dep't of Human Res., 42 A.3d 596, 602 (Md. 2012) (quoting Murray Int'l Freight Corp. v. Graham, 555 A.2d 502, 504 (Md. 1989)).  A lawsuit is barred by collateral estoppel when: (1) the issue decided in the prior action is identical with the one presented in the action in question; (2) there was a final judgment on the merits; (3) the two actions involve either the same parties or persons in privity with those parties; and (4) the party against whom the plea is asserted was given a fair opportunity to be heard on the issue.  Id. (citing Colandrea v. Wilde Lake Cmty. Ass'n, Inc., 761 A.2d 899, 909 (Md. 2000)).

Here, none of Ervin's instant claims relate to the foreclosure sale conducted on behalf of Chase on September 3, 2009, the subject of the settlement agreement referenced above.  Ervin's claims specifically allege miscalculations in the Annual Escrow Statement which resulted in misrepresentations in all subsequent mortgage statements and default notices under the LMA.  These claims are neither identical to, nor could have been resolved, in the earlier dispute.  Accordingly, Ervin is not barred from asserting his instant claims against Chase.

Finally, Chase argues the Annual Escrow Statement accurately reflected an escrow shortage of $5,636.80 when generated even

though the "shortage" was later rolled into the principal balance of the loan on the effective date of the LMA three weeks later.[4] Further, Chase appears to argue Regulation X authorized it to charge the amount calculated in its annual escrow analysis for the full subsequent computation year despite the "shortage" being rolled into the principal balance.[5] Even assuming Chase's arguments are meritorious, however, there remains a material dispute as to the accuracy of the annual escrow shortage amount which resulted in Chase assessing an increased escrow payment.

At the time the July 2012 annual escrow analysis was conducted, Chase treated Ervin's escrow account as having a shortage. (See Def.'s Mot. Summ. J. Ex. H ["July 2012 Annual Escrow Statement"], ECF No. 23-9). The Annual Escrow Statement, however, fails to set forth either the escrow account history or the total amount paid into the escrow account during the preceding computation year as required by Regulation X (12 C.F.R. § 1024.17 (2012)). (See id.). Further, the record is devoid of any evidence establishing an escrow account history resulting in the purported shortage. Finally, the summary of the loan modification, attached to the letter offering to modify the loan, indicates that the

---

[4] The August 6, 2012 statement reflects a principal balance of $282,231.77. (Def.'s Mot. Summ. J. Ex. J ["August 6, 2012 Statement"], at 2, ECF No. 23-11). This balance is $771.32 lower than the principal balance as of July 1, 2012, indicating that the $5,636.80 escrow shortage was not in fact rolled into the principal balance in the time between the Annual Escrow Statement and the August 1, 2012 effective date of the LMA.

[5] See supra Note 4.

modified monthly escrow payment of $814.08 included monthly payments toward a shortage of escrow funds in the amount of $743.63. (Def.'s Mot. Summ. J. Ex. F, at 4, ECF No. 23-7). Thus, the accuracy of the annual escrow shortage amount is a disputed material fact that precludes Chase from being granted summary judgment in its favor. Accordingly, Chase's Motion for Summary Judgment will be denied.

### b. Ervin's Motion for Summary Judgment

First, Ervin argues he is entitled to summary judgment because there is no dispute that Chase failed to properly apply his mortgage payments under the LMA, therein misrepresenting in all subsequent mortgage statements and default notices that he was delinquent, owed late fees, and that Chase could foreclose on his mortgage account. This assertion, however, is without support in the record.

It is undisputed that Ervin made his first payment under the LMA on July 11, 2012, in the amount of $1,671.09. That payment posted to Ervin's account as the August 1, 2012 payment and was applied in a manner consistent with the terms of the LMA, with $385.34 to principal, $471.67 to interest, and $814.08 to escrow. (Def.'s Mot. Summ. J. Ex. I ["Payment History"], at 4, Reference No. 173, ECF No. 23-10). Ervin made his second payment under the LMA on August 2, 2012, in the amount of $1,671.09. That payment posted to Ervin's account as the September 1, 2012 payment and was

11

applied in the same manner as the July 11, 2012 payment. (<u>Id.</u> at 3, Reference No. 180).

By its Mortgage Loan Statement dated August 6, 2012 (the "August 6, 2012 Statement"), Chase reported to Ervin the status of his Loan. The August 6, 2012 Statement reflects a principal balance of $282,231.77. This balance is $771.32 lower than the starting Interest Bearing Principal Balance of $283,003.09, demonstrating that Chase's system had received and properly applied Ervin's first two monthly payments – the August 1, 2012 Payment and the September 1, 2012 Payment – and reduced the outstanding principal balance on the Loan accordingly. (<u>Id.</u> at 2). The August 6, 2012 Statement stated in two places that Ervin's next payment fell due on October 1, 2012. Additionally, the August 6, 2012 Statement stated in four places the amount due on October 1, 2012, was $1,746.15, the new mortgage amount set by the Annual Escrow Statement. (<u>Id.</u>).

Nevertheless, on September 17, 2012, Plaintiff tendered his next monthly payment of $1,670.98 (the "September 17, 2012 Payment"). (Payment History, at 2, Reference No. 184). Because the September 17, 2012 Payment was made prior to the October 1, 2012 due date in a partial amount, the payment was applied entirely to principal and Ervin's October 1, 2012 payment of $1,746.15 remained due and owing. (<u>Id.</u>); (<u>see also</u> Def.'s Mot. Summ. J. Ex.

12

B ["Deed of Trust"], at Sec. 1, ECF No. 23-3) (authorizing Chase to apply partial payments entirely to principal).[6]

Ervin tendered his next payment of $1,670.98 on October 16, 2012.  (Payment History, at 2, Reference No. 185).  Because the October 16, 2012 payment was paid after the October 1, 2012 due date in an amount less than the full amount due, Chase placed the payment in suspense as unapplied funds and assessed a late fee of $42.85.  (Id. at 2, Reference Nos. 185, 186); (see also Deed of Trust, at Sec. 1) (authorizing Chase to apply partial payments in suspense[7]).  By its Mortgage Loan Statement dated October 22, 2012 (the "October 22, 2012 Statement"), Chase reported to Ervin that

---

[6] Ervin argues the manner in which Chase applied the September 17, 2012 Payment to his loan account was improper, without a contractual basis, and inconsistent with the manner in which Chase applied all subsequent short payments.  Chase's application of Ervin's payments, however, was authorized by Sections 1 and 2 of the Deed of Trust ("DOT").  The material difference between the September 17, 2012 Payment and all subsequent payments is that the loan account fell delinquent on October 1, 2012.

Under Section 2 of the DOT, once a payment is accepted and applied to interest, principal, and escrow "[a]ny remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note."  (Deed of Trust, at Sec. 2).  At the time the September 17, 2012 Payment was remitted, there were no other amounts due under the Note and, therefore, Chase was authorized to apply the payment to the principal balance.

Further, under Section 1 of the DOT, Chase was not obligated to apply partial payments to the loan account at the time such payments were accepted but could hold such unapplied funds in suspense until Ervin made a payment to bring the loan current. (Deed of Trust, at Sec. 1). Chase was authorized to hold all partial payments subsequent to October 1, 2012, in suspense because those payments were less than the full amount needed to bring the loan current.  Thus, the manner in which Chase applied Ervin's payments was consistent with the terms of the DOT.

[7] See supra Note 6.

the payment due on October 1, 2012, remained unpaid and that a late fee of $42.85 had been applied. (Def.'s Mot. Summ. J. Ex. L, ECF No. 23-13).

Ervin tendered his next monthly payment of $1,670.98 on November 14, 2012. By its Mortgage Loan Statement dated November 14, 2012, Chase reported to Ervin the status of his Loan. (Def.'s Mot. Summ. J. Ex. N, ECF No. 23-15). Because the November 14, 2012 payment was less than the full amount due, Chase placed the payment in suspense as unapplied funds (adding it to the $1,670.98 from the October 16, 2012 payment that had been placed in suspense the prior month) and assessed a late fee of $42.85. (Id.). From the total of $3,341.96 then in suspense, Chase drew out $1,746.15 and applied it to payment of the past due amount for October 1, 2012, leaving an unapplied funds balance in the account of $1,595.81. (Id.).

By its "Escrow: Taxes and Insurance Statement" dated December 31, 2012 (the "December 2012 Escrow Statement"), Chase informed Ervin that the Loan had an escrow surplus of $3,006.19, and, consequently, his new monthly payment would decrease from $1,746.15 to $1,142.61, effective March 1, 2013.[8] The December 31, 2012 Escrow Statement also informed Ervin that his escrow surplus, an account separate and distinct from the loan account, would be mailed to him, rather than being applied to reduce the total payment due reflected on the December 13, 2012 Statement.

---

[8] The December 31, 2012 Escrow Statement reflects that the reduction in Ervin's monthly escrow payment was attributable to Chase's decision to cease charging him $516.17 per month for PMI.

14

Ervin, however, continued to tender payment less than the full amount due through February 2012. Each payment made for less than the full amount due was placed in suspense as unapplied funds and assessed a late fee of $42.85 until there were enough funds in suspense to cover the full past due periodic payment. By its correspondence dated February 11, 2013, Chase gave notice to Ervin of its intent to foreclose the Loan (the "Notice"). (Pl.'s Cross Mot. Partial Summ. J. & Opp'n Def.'s Mot. Summ. J. ["Pl.'s Cross Mot. Partial Summ. J."] Ex. 3, ECF No. 24-4). Page seven of the Notice itemizes the amount by which the Loan is past due and documents the amount held in suspense as $1,445.47. (Id. at 9).

Ervin elected to pay less than the full amount due because he believed there was an error in the accounting of the escrow analysis. (Ervin Dep. 60:5-15, Feb. 26, 2014, ECF No. 23-22). On November 8, 2012, he submitted to Chase a qualified written request ("QWR"), under Section 2605 of RESPA, inquiring as to the basis for its determination of the amount of his monthly mortgage payment. Even if there was a dispute or actual error as to the escrow analysis[9], however, this dispute did not justify Ervin's decision to pay less than the full amount owed. See 12 C.F.R. § 1024.35(h) (2012) (prohibiting a servicer from requiring a borrower to make a payment that may be owed on a borrower's account as a prerequisite to investigating or responding to a notice of error submitted by a

---

[9] See discussion supra Section II.C.2.a (finding a dispute of material fact as to the accuracy of the Annual Escrow Statement).

borrower, without altering or otherwise affecting a borrower's obligation to make payments owed pursuant to the terms of a mortgage loan while waiting for a response from the servicer).

All of the monthly payments made by Ervin on the Loan during the period of July 1, 2012 to December 31, 2012, therefore, were properly applied by Chase in accordance with the terms of the Note, DOT, and LMA.   Thus, Chase did not misrepresent the delinquent amounts and late fees reflected in the mortgage loan statements between August 6, 2012 and February 13, 2013.[10]

Next, Ervin argues there is no dispute that Chase improperly charged him a monthly sum of $516.17 for PMI during the period of August 2012 to March 2013, which rendered all subsequent mortgage statements, late fees, and default notices false and misleading. This assertion is similarly without support in the record.

When Ervin closed on the Loan in March 2007, he signed three documents evidencing his obligation to pay $516.17 per month as PMI through April 1, 2023. Those documents include: (1) the Private Mortgage Insurance Disclosure (Def.'s Mot. Summ. J. Ex. E, ECF No. 23-6); (2) the First Payment Letter (Def.'s Mot. Summ. J. Ex. D, ECF No. 23-5); and (3) the Initial Escrow Account Disclosure Statement (Def.'s Mot. Summ. J. Ex. C, ECF No. 23-4). Further,

---

[10] Assuming, for the purposes of deciding Ervin's Motion for Summary Judgment, the accuracy of the Annual Escrow Statement. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994)("In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party.") (citing Anderson, 477 U.S. at 255).

paragraph ten of the DOT permits Chase to continue to collect PMI premiums "until [its] requirement for Mortgage Insurance ends in accordance with any <u>written agreement</u> between Borrower and Lender providing for such termination . . . ." (Deed of Trust, at Sec. 10) (emphasis added).  The LMA, however, neither canceled nor modified Ervin's obligation to pay PMI, but expressly stated that "all terms and provisions of the Loan Documents . . . remain in full force and effect" (Loan Modification Agreement, at 5), and that the PMI "may increase as a result of the capitalization which will result in a higher total monthly payment" (<u>id.</u> at 7).

Subsequent to entering into the LMA, Chase performed a short-year escrow analysis in December 2012 and determined that its contract with the PMI insurer had been canceled prior to the LMA effective date. (<u>See generally</u> Def.'s Mot. Summ. J. Ex. P, ECF No. 23-17).  Upon determining that the PMI policy was canceled, Chase calculated an escrow account surplus of $3,006.19, which was refunded to Ervin on March 20, 2013, and opted to terminate Ervin's contractual obligation to pay PMI premiums under the DOT beginning March 1, 2013.  (<u>Id.</u>); (<u>see also</u> Def.'s Mot. Summ. J. Ex. Q, ECF No. 23-18).  Ervin contends the fact that Chase decided to cease collecting PMI and to send him a refund constitutes an admission that it knowingly made deliberate misstatements, misrepresentations, and omissions which amount to unfair and deceptive trade practices.  The Court disagrees.

First, Ervin's assertion that his monthly mortgage payments increased to $1,746.15 on October 1, 2012, because Chase elected to charge him for PMI premiums is clearly refuted by the record. Ervin's escrow account was assessed an additional monthly sum of $93.95 so as to recover an escrow shortage of $5,636.80 over a sixty month period commencing October 1, 2012.  (See July 2012 Annual Escrow Statement).  Second, Ervin was on notice at the time he entered into the LMA that the PMI premiums were included as part of his estimated monthly escrow payment.   He waited, however, until November 8, 2012, to dispute the calculation of the escrow amount for the first time. (See generally Def.'s Mot. Summ. J. Ex. M, ECF No. 23-14).   Finally, in the absence of any written agreement to the contrary, paragraph ten of the DOT allowed Chase to continue to collect the PMI premiums despite the policy being canceled.   Nevertheless, Chase opted to terminate the PMI beginning March 1, 2013, where it was not contractually obligated to do so. Thus, Chase properly charged Ervin for PMI.

Finally, Ervin argues Chase misrepresented, in a December 31, 2012 letter, that it would refund the escrow surplus within twenty business days.  Chase, however, held those funds until after March 20, 2013.  Chase does not dispute the December 31, 2012 letter or that it returned the escrow surplus on March 20, 2013, but argues the statement does not constitute a false statement under the MCPA because Ervin was not harmed by the delay.

Under the MCPA, plaintiffs must show they are entitled to recover actual damages sustained "as the result of" the defendant's deceptive practices. Md. Code Ann., Com. Law, § 13-408(a) (West 2014). Here, Ervin received the escrow surplus check on March 20, 2013. Further, Ervin acknowledged even without the escrow surplus refund, he had sufficient funds to pay the total amount due to Chase to bring his account current. (Ervin Dep. 108:3-21). Ervin, therefore, suffered no harm by the delay. Accordingly, Chase's inaccurate statement that the escrow surplus would be refunded within twenty business days is not actionable.

For the foregoing reasons, Ervin is not entitled to summary judgment in his favor. Accordingly, Ervin's Motion for Summary Judgment will also be denied.

### III. CONCLUSION

For the reasons given above, Chase's Motion for Summary Judgment (ECF No. 23) is DENIED and its Motion for Leave to File Surreply (ECF No. 35) is GRANTED. Ervin's Cross Motion for Partial Summary Judgment (ECF No. 24) is DENIED. A separate Order will follow.

Entered this 13th day of August, 2014

/s/
_____
George L. Russell, III
United States District Judge